UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In Re:

WADE MARTIN ROME and
KATHLEEN MALONEY ROME,

    Debtors.
_____/

Case No. 6:15-bk-02498-KSJ
Chapter 7

CARLA P. MUSSELMAN, CHAPTER 7
TRUSTEE FOR THE ESTATE OF
WADE MARTIN ROME AND
KATHLEEN MALONEY ROME and
ROBERT THOMAS, individually FREDERICK
LAUFER, individually, and BRIAN KAUFMAN,
individually,

    Plaintiffs,

v.

WADE MARTIN ROME and
KATHLEEN MALONEY ROME,

    Defendants.
_____/

Adv. Proc. No.

## AFFIDAVIT

BEFORE ME, the undersigned authority, duly authorized to administer oaths, personally appeared Sandra Trudeau, who, being first duly sworn, deposes and says:

1. I am the owner of property located at 2085 Eastwood Drive, Merritt Island, Florida 32952 (the "Debtor Residence"), and have been the landlord to Wade Martin Rome (the "Debtor Husband") and Kathleen Maloney Rome (the "Debtor Wife"), together referred to as the "Debtors," both of whom filed a bankruptcy case styled as <u>In re Wade Martin Rome and Kathleen Maloney Rome</u>, Case No. 6:15-bk-02498-KSJ (the "Bankruptcy Case") and make this affidavit from my personal

1

knowledge and from the business records that I maintain in the regular course of business with respect to the Lease, defined below, including but not limited to the bank records for the Lease account (the "Lease Account").

2. I agreed to rent the Debtor's Residence to the Debtor Husband in May, 2012, having met him in person when he responded to an ad I placed on Craigslist, among other potential renters. The Debtor Husband told me that he had just sold his company for $65,000,000 and was looking for a Florida residence on Merritt Island because his son, Gage Rome, had been scouted/recruited and asked to play football for Merritt Island High School. He requested a four year Lease as his son would be playing football all four years of high school and then they either would be moving back to their residence in Missouri or building a new home. The Debtor Husband indicated that he and the Debtor Wife owned a mansion in Macon, Missouri, for which he showed me photographs, and would be spending summers at that residence (the "Missouri Residence"). The Debtor Husband explained that he wanted to be on the lease without his wife because there was some legal trouble in Missouri due to their attempt to sell the Missouri Residence, which was a historical landmark, and would add the Debtor Wife to the lease as soon as the legal issues were concluded. I agreed to do that and the lease was signed and in the name of the Debtor Husband only (the "Lease"). I was favorably impressed with the Debtor Husband and believed that there would be less wear and tear on the Debtor Residence if the family were not there all year because they would spend the summers in their Missouri residence and that payment of rent would not be an issue given the recent sale of his company. At no time during our negotiations of the Lease or the months following did the Debtor Husband give me any indication that the Debtor Wife would not be residing and/or was not residing at the Florida Residence. Moreover, I had many communications in person and by e-mails and texts with the Debtor Wife about how she liked Florida, and about issues with respect to the Debtor Residence, including but not limited to issues with the carpet in the master bedroom, the air conditioners, the pool screen, as well as animal control issues related to the pets that the Debtors kept at the Debtor Residence. At no time during these

communications did the Debtor Wife indicate that she was not residing in the Debtor Residence, and to the contrary, it was apparent that she was in fact living at the Debtor Residence.

3. In addition to rent under the Lease, collected quarterly, the Debtors were responsible for utilities on the Debtor Residence. However, as an accommodation and at the request of the Debtor Husband, I left the utilities in my name through the Petition Date, paying them when due and then seeking and securing reimbursement from the Debtor Husband in an equivalent amount.

4. During the first year of the Lease, when meeting the Debtor Husband for the purpose of being paid rent on the Lease, the Debtor Husband would often drive a Harley Davidson motorcycle (the "Harley Motorcycle") or an Indian motorcycle (the "Indian Motorcycle"). Once I asked the Debtor Husband how many motorcycles he had to which he replied "ten" but indicated that not all of them were his, as the Debtor Wife owned one or two.

5. In connection with some of the issues with the Debtor Residence initiated by one or both of the Debtors that related to an air conditioning problem, I had occasion to be in the upstairs office in the fall of 2013, together with a repairman, and I observed glass office furniture (collectively, the "Glass Furniture"). The Debtor Husband told me that the Glass Furniture was the Debtor Wife's favorite furniture in the entire world and she would never give it up. Based on my experiences of over 23 years working for the Chicago and North Western Railroad directing purchases of office furniture, I know the glass furniture was extremely expensive.

6. Likewise, in the same year, I observed a huge safe located in the master bedroom (the "Bedroom Safe"). The Debtor Husband told me that it had taken 5 or 6 big football players to carry the Bedroom Safe up the stairs, which troubled me due to the apparent weight.

7. I also observed two stainless steel sub-zero refrigerator freezers in the garage (collectively, the "Refrigerators") and I was impressed because the make and model of the Refrigerators was better than the makes and models of the refrigerators owned by my many wealthy friends.

8. When I leased the Debtor Residence to the Debtors I left certain of my own furniture from when I resided at the home, including but not limited to a grand piano, patio furniture, a hot tub, an 8' sail fish, a barbecue grill, many hanging pictures and silk plants, 100's of pots from my outside 40' greenhouse, 7' solid cement statues, two portable A/C units, two outdoor dog houses, a hospital bed, exercise equipment, and other things (collectively, the "Landlord Furniture"). After the Debtors moved into the Debtor Residence, the Debtor Husband called me and asked if the Debtors could remove and store certain of the Landlord Furniture as it was not to the Debtor Wife's taste and I agreed. I personally met Kathleen Rome at the home where she resided in September 2012 to begin moving some of these items. I even paid her sons to move my outdoor items from the greenhouse into my Van on a few occasions.

9. At some point in 2013, or early 2014, I challenged the Debtor Husband with losing, moving, or hiding two expensive ladders that I had left at the Debtor Residence and needed for a repair at one of my other properties. In response and to "prove" that he did not have my ladders, the Debtor Husband took me to his warehouse unit located at 358 Hibiscus, Merritt Island (the "Warehouse"). When the Debtor Husband opened the door of the Warehouse my jaw dropped at the quantity and quality of the items that were located at the Warehouse, including but not limited to an antique car that looked in pristine condition, a large box truck, a van, a gold antique leaf desk Wade said was worth over $100,000 and a smaller table or desk that Wade said was worth over $25,000, many other antiques, as well as many items of artwork that were wrapped up, generators, exercise equipment, tons of computer equipment, 8-10 massive water containers that took my breath away, all kinds of "man" toys, miscellaneous pressure washers and other similar lawn equipment, posts that were 40 feet or more high (that the Debtor Husband indicated would be used to build a house on stilts for the Debtors) and many other items (collectively, the "Warehouse Assets"). While I did observe some of my Landlord Furniture in the Warehouse, I was so impressed at the amount and range of the items that filled 4,000 square feet, and were on huge shelves to the ceiling on the sides of the Warehouse, that I totally forgot

4

to look for my ladders. The Debtor Husband observed my reaction and stated to me "This is nothing, you should see the 5,000 square foot warehouse I have in Titusville." In explanation for the box truck, the Debtor Husband told me he needed it to transport his money to and from Missouri as he was tired of paying a private pilot to fly his money to and from Florida. At the conclusion of the visit to the Warehouse I purchased one of the generators that was there.

10. The Debtor Husband and I spoke frequently during the time of the Lease and he would often tell me about how he bought and sold gold and silver and urge me to "invest" with him, although I always refused. At one point, he told me he had just sold some buffalo gold coins to his father, Vernon Rome ("Vernon") and said that Vernon "likes the buffalo coins like I like the gold eagle coins."

11. On other occasions the Debtor Husband would show me pictures on his mobile phone relating to gold transactions he was involved in. It was always difficult to get the rent timely, however, and most of our communications related to how and when delinquent rent would be paid. Against my better judgment, on or about November 14, 2014, I accepted some silver bullion and one silver coin from the Debtor Husband in payment of part of his delinquent rent. I have provided to the Trustee and creditors of the Debtors a copy of the receipt for the silver written by the Debtor together with photos of the silver and am prepared to file a copy with the Court if required. As of the date of this affidavit, I remain in possession and custody of the silver that was tendered to me by the Debtor Husband in part payment for rent in November 2014.

12. Gaining entry to the leased home was always very difficult and as time went on, I had increasing problems with my repairmen and services staff gaining access to the Debtor Residence and the surrounding property. Several of the companies maintaining my property (Apex for the lawn and Flip Flop Pool Company for the swimming pool and hot tub) refused to provide services due to the issues that resulted and that I have described in my motion for relief from stay filed in the Bankruptcy Case. The Debtors maintained a security system at the Debtor Residence and I observed on many occasions when I was at the house a computer monitor posted in the front window of the Debtor

Residence that presumably allowed the Debtors to screen all visitors.

13.  On or about May 4, 2015, I visited the Debtor Residence for the purpose of collecting rent for the quarter beginning on April 1, 2015, that was then delinquent. While at the Debtor Residence I sat a table in the dining room with the Debtor Husband. In connection with our discussions about the delinquent rent, the Debtor Husband removed from a "man" purse and showed me a gold coin that he stated had a value of approximately $44,000, also showing me a book describing the coin and its value in support of his statement (the "Gold Coin"). The Debtor Husband offered the Gold Coin to me I believe in lieu of money for rent presently owed to me. I declined the offer of the Gold Coin, telling the Debtor Husband that I do not collect coins, other than gold eagles, and needed cash to make my mortgage payments.

14.  During the May 4, 2015, visit to the Debtor Residence, the Debtor offered to me and I agreed to accept eight (8) gold bars of bullion, to be credited in the amount of $1230 for each bar, leaving a balance owed of $360 cash, which was tendered to me prior to my departure. The Debtor Husband agreed to deliver the gold bullion bars to me within a day or so. I have provided handwritten notes written by the Debtor Husband memorializing our agreement to the Trustee and certain creditors and am prepared to file them with the Court if required.

15.  On or about May 6, 2015, I met the Debtor Husband at a gas station located on the corner of Route 520 and New Found Harbor Road in Merritt Island for the purpose of taking delivery of the gold bullion bars. The Debtor Husband arrived in an older red pick-up truck and got out of his truck carrying a bag that was filled with many silver bullion 100 oz. bars, at least 20 or 30 of them. The Debtor Husband offered me the silver bullion bars in substitution for the gold bullion bars that I had agreed to accept in lieu of delinquent rent. I refused to take possession of the silver bullion bars on the basis that I do not deal in silver and needed cash for the purpose of making my mortgage payments or gold eagle coins that I have experience buying and can readily value. The Debtor Husband indicated that he had only the silver bullion bars with him and he left without consummating

our agreement for delinquent rent. I was surprised to see the Debtor Husband driving the red pick-up truck as I had previously seen him driving a shiny newer expensive black truck, the make and model of which I do not recall (the "Black Truck"), or the Harley or Indian Motorcycles.

16. I then met the Debtor Husband for lunch at on May 8, 2015. The Debtor Husband arrived for the lunch on his Harley Motorcycle. At the beginning of the lunch, which lasted for more than two hours, the Debtor Husband handed me eight (8) gold eagle coins in substitution for the gold bullion bars that we had agreed would be given to me in lieu of delinquent rent. During this same timeframe, the Debtor Husband asked me if I would do him a huge favor and let him keep these coins as he could sell them to one of his customers at a large mark-up for more money than was being credited pursuant to our May 4, 2015, agreement. The Debtor Husband explained that he needed the cash and if I would agree to let him sell these gold coins to his customer, he promised he would get me other gold eagle coins in a day or so. I agreed to letting him keep the gold eagle coins and expressed my interest in obtaining an extra gold eagle coin for an appropriate credit on future rent, making the total nine (9). The Debtor Husband agreed to that request. When I commented on his Harley Motorcycle, the Debtor Husband showed me pictures of himself and the Debtor Wife on what he described as a two week recent cross-country trip, both riding Harley Davidson motorcycles. When I commented on the Debtor Wife owning a Harley Davidson motorcycle he said "Doesn't every wife?"

17. Thereafter, the Debtor Husband failed to deliver the gold eagle coins as promised and after my numerous communications ultimately gave me a check dated on or about May 22, 2015, in the amount of $6,150, which was returned by my bank on May 28, 2015, for insufficient funds. The Debtor Husband made or caused to be made a deposit to the Rental Account for the May Check, thereby paying the delinquent rent for the second quarter of 2015. Months prior to this time, the Debtor Husband told me that he was going to have to stop making deposits into the Lease Account at my bank because "the bank was taking pictures of the vehicles driving through the drive-thru window." At the time of the statement, and without knowledge of an impending Bankruptcy Case, I thought nothing of

the statement and did not follow up with the Debtor Husband as to why he would be concerned, although now I wish I had. I have provided to the Trustee and certain creditors a copy of the Lease Account evidencing the Debtor Husband's post-petition deposit/payment and am prepared to file them with the Court if required.

18.     I travel out of Florida every summer and therefore, although rent was due for the third quarter of 2015 on July 1, 2015, I was unable to meet the Debtor Husband to address the delinquent rent until late July. In or about late July, the Debtor Husband came to my home for the purpose of discussing and arranging payment for the third quarter rent. While the Debtor Husband was at my home, he told me that he and the Debtor Wife had filed for bankruptcy, and this is when I learned for the first time about the Bankruptcy Case, even though I must admit, I really did not believe him since he has lied to me so many times before. I just figured another excuse not to pay me on time. At this meeting, the Debtor Husband described the Debtor Wife having to testify and told me that "Her performance had been 'magnificent' in testifying." He said she acted like a "dumb housewife" who knew nothing about the financial dealings of her husband's selling of his business and that she actually cried. He was laughing the entire time he was telling me this story. (I personally felt sick that he gained so much pleasure in telling me this story and reliving his wife's lies while under oath; he was just so proud of it, it nauseated me.) Having seen firsthand and with my own eyes the quantity and quality of the Debtors' assets, including but not limited to the Warehouse Assets, the Harley Motorcycle, the Indian Motorcycle, the Refrigerators, the Glass Furniture, and the Gold Coin, I directly asked the Debtor Husband if he was hiding assets to which he replied with a **big grin on his face and a head shaking "yes" and then "no" repeatedly**. During that visit, the Debtor Husband gave me two post-dated checks for the third quarter rent, one being dated for August 1, 2015, and one for August 8, 2015, copies of which have been provided to the Trustee and certain creditors and that I am prepared to file with the Court if required. I deposited the first check after the date it was dated for and it was returned for insufficient funds. I tried to deposit the second check after the date it was dated for but a

stop payment had been placed on the check. As of the date of this affidavit, I have not received or been paid funds in lieu of the August Checks.

19. On or about October 27, 2015, I obtained copies of some of the photographs that the Chapter 7 trustee, Carla Mussellman (the "Trustee") had taken at the Debtor Residence during an inspection in August 2015 (the "Inspection"), including a photo of one of the Refrigerators and the Bedroom Safe, both of which are attached to the Complaint filed by the Trustee as part of Composite Exhibit "A: and are hereby incorporated by reference herein. I have reviewed testimony to the contrary by the Debtors but can attest to the fact that neither the Refrigerator nor the Bedroom Safe belong to me, or belonged to me, at any point in time preceding or during the Lease. I can also attest to the fact that the Bedroom Safe is the same safe that I observed during my visits to the Debtor Residence before the filing of the Bankruptcy Case.

20. Likewise, I have reviewed testimony of the Debtor Husband that a payment to Vernon made in March 2015, was to reimburse a payment to me on the Lease, made by Vernon during the Debtors' absence from the Debtor Residence. I can attest to the fact that although the Debtors have certainly talked about Vernon, I have never met him and have never received or accepted a rent payment from Vernon on behalf of the Debtors or the Debtor Husband at any point in time during the Lease.

FURTHER AFFIANT SAYETH NOT. Dated this 28th day of October, 2015.

_Sandra Trudeau_
**SANDRA TRUDEAU**

STATE OF FLORIDA
COUNTY OF __BREVARD__

SWORN TO AND SUBSCRIBED before me this 28th day of October, 2015, by Sandra Trudeau, who is personally known to me, or who produced __Florida Drivers License__ as identification.

LaLonni L. Stephens
State of Florida
My Commission Expires 03/06/2018
Commission No. FF 99350

_/s/ LaLonni L. Stephens_
Notary Public, State at Large
(Serial Number and Seal)

9